IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

AUDUBON SOCIETY OF PORTLAND,       )
AUDUBON SOCIETY OF GREATER         )
DENVER, CENTER FOR BIOLOGICAL      )
DIVERSITY; and THE NEW MEXICO      )      Case No. 04-670-KI
AUDUBON COUNCIL, non-profit        )
corporations,                      )           OPINION
                                   )
                   Plaintiffs,     )
                                   )
        vs.                        )
                                   )
UNITED STATES FISH AND WILDLIFE    )
SERVICE,                           )
                                   )
                   Defendant.      )
                                   )
        vs.                        )
                                   )
NORTH AMERICAN FALCONERS           )
ASSOCIATION (NAFA), STATE OF       )
WYOMING, STATE OF ARIZONA, *ex rel.* )
*The Arizona Game and Fish Commission* )
*and the Arizona Game and Fish*      )
*Department,*                        )
             Intervenor-Defendants,  )

Daniel J. Rohlf
Susan Jane M. Brown
Pacific Environmental Advocacy Center
10015 S. W. Terwilliger Blvd.
Portland, Oregon  97219

      Attorneys for Plaintiffs

Karin J. Immergut
United States Attorney
Steve O'Dell
Assistant United States Attorney
Mark O. Hatfield United States Courthouse
1000 S. W. Third Avenue, Suite 600
Portland, Oregon  97204-2902

Kelly A. Johnson
Acting Assistant Attorney General
Lori Caramanian
U. S. Department of Justice
Environment and Natural Resources Division
General Litigation Section
999 18th Street, Suite 945 NT
Denver, Colorado  80202

      Attorneys for Defendants

Brian J. King
Schwabe Williamson & Wyatt, P. C.
1600-1900 Packwest Center
1211 S. W. Fifth Avenue
Portland, Oregon  97204

Faith Kalman Reyes
Frank M. Bond
Simons & Slattery, LLP
P. O. Box 5333
Santa Fe, NM  87502-5333

Susanne LaCampagne
Miller Nash LLP
111 S. W. Fifth Avenue, Suite 3400
Portland, Oregon  97204-3699

Jay A. Jerde
C. Levi Martin
Office of the Wyoming Attorney General
123 State Capitol
Cheyenne, WY  82002-0001

Attorney for Defendant-Intervenors


KING, Judge:

"There are three kinds of lies:  lies, damned lies and statistics."[1]  The parties in this action offer different interpretations on the meaning of the statistics used to analyze the vitality of the peregrine falcon population.

The American peregrine falcon ("peregrine") was listed as endangered under the Endangered Species Act ("ESA") in 1973 and was delisted in 1999.  All parties to this action consider the peregrine's recovery under the protections of the ESA to be an extraordinary success story.  They disagree, however, on what should happen to peregrines now that they have been delisted.

On March 1, 2004, the United States Fish and Wildlife Service ("FWS") issued a Finding of No Significant Impact, allowing a 5% take of nestling peregrines in the western United States. Plaintiffs, a group of nonprofit conservation and public interest organizations, challenge FWS' actions under the National Environmental Policy Act ("NEPA"), the Migratory Bird Treaty Act ("MBTA"), and the Administrative Procedure Act ("APA").

Before the court is Plaintiffs' Motion for Summary Judgment (#51), Intervenor-Defendant State of Wyoming's Motion for Summary Judgment (#60), Cross Motion for

---

[1]  Frequently attributed to Benjamin Disraeli (1804-1881), but never found in his written works.  The Columbia World of Quotations, Number 16799 (1996).

Summary Judgment by Defendant/Intervenor State of Arizona (#63), Federal Defendants'

Motion for Summary Judgment (#71), and Defendant-Intervenor North American Falconer's

Association's Cross Motion for Summary Judgment (#73). For the reasons below, I grant

summary judgment in favor of FWS and the intervenors.

## MOTIONS TO STRIKE

FWS and defendant-intervenors North American Falconers Association ("NAFA") and

Wyoming all move to strike documents filed by plaintiffs with their reply brief: the Declaration

of Bierzychudek and two articles from the New York Times about the West Nile virus. In case I

do not strike the documents, NAFA and Wyoming filed rebuttal material: the Declaration of

Redig and the Declaration of Hunt.

Judicial review of an agency decision usually focuses on the administrative record in

existence at the time of the decision. The agency must justify its action by reference to the

reasons it considered at the time it acted. Friends of the Clearwater v. Dombeck, 222 F.3d 552,

560 (9th Cir. 2000). Extra-record materials may be relied upon by the court under a few

exceptions: (1) if necessary to determine if the agency considered all relevant factors and

explained its decision; (2) if the agency relied on documents not in the record; (3) to explain

technical or complex subject matter; or (4) if plaintiff makes a showing of agency bad faith.

Lands Council v. Powell, 395 F.3d 1019, 1030 (9th Cir. 2005). The exceptions are narrowly

construed and applied so that the court proceeds with the "proper deference to agency processes,

expertise, and decision-making." Id. Post-decision information cannot be advanced as a new

rationalization to either sustain or attack an agency's decision. Southwest Center for Biological

Diversity v. United States Forest Service, 100 F.3d 1443, 1450 (9th Cir. 1996).

If a paragraph strays into "[c]onsideration of the evidence to determine the correctness or wisdom of the agency's decision[,]" it is opinion testimony that is not permitted as part of the evidentiary record. Asarco, Inc. v. United States Environmental Protection Agency, 616 F.2d 1153, 1160 (9th Cir. 1980).

Plaintiffs rely on the third exception to the prohibition, to explain technical or complex subject matter. They contend that the Bierzychudek Declaration explains two technical issues: (1) what does it mean to say that an action will reduce the rate of growth of a population; and (2) did FWS properly report in the 2004 EA the reduction in the peregrine population's rate of growth. I agree that the first issue is a technical subject matter on which I could use a tutorial. Thus, the material is admissible. Whether the FWS properly reported an item, however, falls within the prohibition against opinion testimony on the correctness of an agency's decision and thus, is not admissible.

Based on that differentiation, the following paragraphs of the Bierzychudek Declaration are stricken: 4, 6, 7, the phrases in paragraphs 8 and 9 that refer to FWS mistakes or confusion, 10, 11, 12 except for the last sentence, 13, and 14.

Concerning the two New York Times articles, plaintiffs contend they are necessary to assist the court in assessing whether FWS appropriately ignored the potential impacts of West Nile virus on peregrines in assessing cumulative impacts in the 2004 EA. The articles, however, do not explain technical or complex subject matter. I grant the motion to strike them both.

## FACTS

Peregrine falcons declined precipitously in North America following World War II due to the use of pesticides, mainly DDT, which affected peregrine's reproduction. About 80% of the

American population of nesting American peregrine falcons are found in the western United States: Alaska, Arizona, California, Colorado, Nevada, New Mexico, Oregon, Utah, Idaho, Montana, Washington, and Wyoming. Use of the pesticides peaked in the 1950s and early 1960s but continued through the early 1970s.

The American peregrine falcon was listed as endangered under the ESA in 1973 and delisted on August 25, 1999, after the peregrine population recovered due to a number of factors. Prior to delisting, peregrine falcon population numbers in the Rocky/Mountain/Southwest recovery plan surpassed the objective of 183 pairs by 352, for a total of 535 pairs of peregrine falcons. AR 208.

FWS published an Environmental Assessment for Falconry Take of Nestling Peregrine Falcons in the Contiguous United States and Alaska in April 2001 ("2001 EA"). The document was based on modeling which FWS believed used the conservative assumption that all peregrines first breed at age three. FWS then realized that an error was made when the model was run, with the age of first breeding being set at two, and not at three, as FWS intended. The error caused an over-estimation of the population growth. When the model was rerun with the corrected assumption, it showed a decline in the population rather than an increase, even when there was no take of nestlings. FWS withdrew the 2001 EA on March 28, 2002. AR 1994, 2001, 2073.

FWS believed that the corrected modeling contradicted evidence showing that peregrine populations were increasing. It reasoned that one or more of the parameters must be wrong and corrected the breeding age and post first-year mortality rate to reflect real world conditions based on what it considered the most current population and productivity data for the western United

States.  The corrected model assessed the effect of take in a population with the proportions of breeding two-year-olds ranging through 0%, 20%, 40%, 60%, 80%, and 100%.  FWS also believed that post-first-year mortality was less than the 20% previously assumed.  The corrected model assessed the effect of take in a population with post-first-year mortality of 10%, 15%, and 20%.  AR 6048, 6063, 6078-83.  FWS also changed the focus of its analysis:  "Rather than basing our decision on population growth with specific mortality and productivity rates, in this revision we focused on the effects on the rates of change in the population that would result from different levels of take."  AR 2504.

FWS published a draft revised EA in September 2002 and took comments.  In December 2003, FWS adopted a Monitoring Plan for the peregrine.

On March 1, 2004, FWS published a Final Revised Environmental Assessment ("2004 EA").  AR 6046-6118.  The 2004 EA considered six alternatives:  no action, a take of up to 5% of annual peregrine production, a take of up to 10% of annual production, a take of up to 15% of annual production, a take of up to 20% of annual production, and lifting all restrictions on take.

Also on March 1, 2004, FWS issued a Finding of No Significant Impact ("FONSI") to allow a take of 5% of nestling peregrines for falconry in Alaska and the contiguous United States west of 100° longitude.  AR6115.  FWS concluded that the preparation of an environmental impact statement was not required.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The initial burden is on the moving party to point out the absence of any genuine issue of material

fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate

through the production of probative evidence that there remains an issue of fact to be tried.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the

evidence is viewed in the light most favorable to the nonmoving party. Universal Health

Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

Defendant-intervenors in this action, NAFA, Wyoming, and Arizona, all filed motions for

summary judgment which raise many of the same issues raised by FWS. Although I have

reviewed their briefs carefully, I do not call out their arguments separately in this opinion unless

a defendant-intervenor raises an issue not raised by FWS.

I.      Migratory Bird Treaty Act

Under the MBTA, it is illegal to pursue, hunt, take, capture, kill, or possess, a migratory

bird, including a peregrine, except as authorized by a valid permit. 16 U.S.C. § 703. The

regulations provide for falconry permits. 50 C.F.R. § 21.28. Permits may not be issued if the

authorization potentially threatens a wildlife population. 50 C.F.R. § 13.21(b)(4).

Plaintiffs allege that FWS' decision to allow falconry take violates the MBTA because

FWS formed an arbitrary and capricious conclusion when it decided that allowing take of up to

5% of nestling peregrines in the western United States does not "potentially threaten" the

region's peregrine population. In general, plaintiffs argue that FWS' finding is arbitrary and

capricious because: (1) there is no rational connection between the facts in the record and FWS'

finding; and (2) there is no adequate explanation of the analytical methods and assumptions.

FWS notes that the MBTA, which expressly contemplates the hunting and take of birds, is to ensure the maintenance of a viable population so that the population survives as a species and can serve as a natural resource for hunters.  FWS contends that plaintiffs cannot show that FWS' determination – that a take of 5% of nestlings would not threaten the peregrine population – is arbitrary and capricious.  It argues that plaintiffs' objections are nothing more than a quarrel with the conclusions of agency experts over matters in which FWS is entitled to substantial deference from the court.

Plaintiffs' claim under the MBTA is reviewed under the Administrative Procedure Act ("APA").

Under the APA, the court may overturn an agency action only if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 377, 109 S. Ct. 1851 (1989); Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211 (9th Cir. 1998), cert. denied, 527 U.S. 1003 (1999).  In determining whether agency decision is  arbitrary and capricious, courts "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  Marsh, 490 U.S. at 378.  "A decision is arbitrary and capricious if the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm., 92 F.3d 940, 942 (9th Cir.1996) (quoting Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29,

43, 103 S. Ct. 2856, 2867 (1983)).  The agency must articulate a rational connection between the

facts found and the conclusions made.  Oregon Natural Resources Council v. Lowe, 109 F.3d

521, 526 (9th Cir. 1997).  Review under this standard is narrow, and the court may not substitute

its judgment for the judgment of the agency.  O'Keeffe's, 92 F.3d at 942.  The court also must

give deference to the agency when there is a difference of opinion on the impact of the proposed

action, including when there are disagreements between different federal agencies.  Southwest

Center v. United States Forest Service, 100 F.3d 1443, 1449 (9th Cir. 1996).

     A.     Cause of Action against the Federal Government

Relying on the statutory language, NAFA argues that an MBTA claim cannot be stated

against the federal government.  Alternatively, NAFA contends that because the MBTA has no

civil enforcement provision of its own, a claim cannot be brought under the APA for an MBTA

violation.  This is because the APA provides the scope of review but does not provide a

mechanism for obtaining judicial review.  Thus, NAFA argues that plaintiff is limited to a NEPA

claim.

Although other circuits disagree, see Sierra Club v. Martin, 110 F.3d 1551, 1555 (11th

Cir. 1997) (MBTA does not apply to federal government), the Ninth Circuit has held that anyone

adversely affected or aggrieved by an agency action alleged to be a violation of the MBTA has

standing to seek judicial review of that action, including actions by federal agencies.  City of

Sausalito v. O'Neill, 386 F.3d 1186, 1204 (9th Cir. 2004) (National Park Service).  Thus,

plaintiffs here may proceed on their MBTA claim.

B.     Population Increase

Plaintiffs contend that the record does not support FWS' assumption that the peregrine population has increased substantially since delisting. Plaintiffs point to several areas of the 2004 EA which they believe are deficient.

1.     Increase in Alaska

Plaintiffs are concerned that the vast majority of the increase since delisting is based on speculation about peregrines in Alaska that were not included in earlier population totals. FWS notes that the 2004 EA considers Alaska separately. Additionally, the population in the contiguous western states increased by 11% between 1989 and 2003. FWS argues that plaintiffs' objections to the methodology used to gather information to formulate the Alaska population number are without merit.

Table 1 in the 2004 EA breaks down the current peregrine population by state, showing the 1998 reported nesting pairs, the current nesting pairs, and the recent productivity. Alaska has the largest peregrine population in one state by far. In 1998, there were 301 reported nesting pairs in Alaska and 790 in the other eleven contiguous western states, for a total of 1,091 in the entire western United States. In 2003, Table 1 shows 930 current nesting pairs for Alaska and 879[2] for the contiguous western states, for a total of 1,809. Thus, the count increased by 701 for the western United States, of which 629 are in Alaska. As noted in the 2004 EA, the 2003 data for Alaska includes data for areas not previously assessed which was extrapolated from known

---

[2] The chart has an arithmetic error. The total is actually 862. This error is carried through to the total for the entire western United States, which is actually 1,792 but is reported in the table as 1,809. Because the numbers are so close, I will use the total as shown in the chart to reduce confusion.

areas by John Wright, an Alaska state employee, and Bob Ritchie, a private contractor. AR 6057, 6076-77. Plaintiffs are concerned about Ritchie's credentials and whether the growth in the Alaska peregrine population is really growth at all.

Wright got his information from Ritchie and Skip Ambrose, a National Park Service employee. Ritchie does state that he would not want his estimate to become the "written word" but he explains how he arrived at the numbers. Ritchie counted 160 known pairs in one part of Alaska and an additional minimum of 150 pairs in another portion of Alaska. Although the second area had not been searched since 1998, he was confident in the number because of continued growth on monitoring streams in the area since 1998. This yields 310 pairs in a 50,000 square kilometer portion of east central Alaska. By studying a source on the ecoregions of Alaska, Ritchie knew that there were at least 150,000 square kilometers of similar upland country containing broad rivers where peregrines had been recorded. The records for this area had not been updated since the mid-1990s. Ritchie then extrapolated the known 310 pairs over this additional land mass, arriving at a figure of at least 930 pairs in the interior of Alaska, not including some broad river valleys and associated uplands of the Copper, Susitna, and Matanuska Rivers. Ritchie also provided detailed statistics in 2003, including productivity averages, for one portion of the Tanana Yukon Uplands which he had been surveying with a helicopter since 1995. In that area, peregrines had become the most abundant cliff-nesting raptor in the region. AR 4798-4804.

It is true that the Alaska data contains an extrapolation. The number is well supported, however, and was passed along by the Alaska Fish and Game employee, John Wright. I do not see any lack of expertise on Ritchie's part, even though he is not a state employee. Due to the

size of the area being surveyed, and the preferred locations of the aeries, it would take an extraordinary effort to count each nesting pair instead of relying on extrapolation. The 2004 EA also does not try to hide the extrapolation and calculates the data from the contiguous western states apart from the Alaska data. The contiguous western states had an 11%[3] increase between 1998 and 2003. Use of the Alaska data to bolster this increase was not unfounded or irrational.

2.      Lack of Current Data in some States

Plaintiffs note that FWS admits in the 2004 EA that it had no current data about peregrine numbers in four states with large populations: California, Oregon, Utah, and Arizona.

FWS contends that it relied on the best data available from each state. Some states had 2003 surveys. When a state did not have a current survey, FWS consulted with state agencies and others with expertise to determine the number of breeding pairs in the state. FWS notes that it possessed additional population data from 96 randomly monitored peregrine falcon sites in Idaho, Oregon, California, Nevada, and Washington. It argues that the numbers in the 2004 EA represent the minimum population because time and resources prevent an exhaustive search for every aerie in every state. FWS took a conservative approach and assumed zero population growth in Arizona, California, Oregon, and Utah because no statewide survey had been conducted since delisting in 1999, or the following year, 2000. FWS also argues that the primary cause for the decline in the peregrine population, DDT, ceased in the 1970s, resulting in a steady recovery in the peregrine population. FWS contends that plaintiffs provide no basis to show that the trend would suddenly reverse in the span of a few years after delisting in 1999.

--------------------

[3]  Actually 9% once the arithmetic error is corrected.

It is clear that both state and federal employees, along with other interested individuals, are concerned that survey efforts are inconsistent from state to state and year to year, likely due to budget constraints. This is particularly true because FWS did not adopt the Monitoring Plan until December 2003. AR 1474, 1922, 6092. FWS based its assessment on numbers provided by state natural resources agencies or by people to whom FWS was directed by the state agency personnel. Although no one believes that the numbers represent all aeries in the western United States, FWS used the best data available. AR 6093. I note that plaintiffs do not point to a better source of data. Their concern is that they do not trust the data as much as FWS since the data is not current for some of the states. Plaintiffs fear that a decline in a state's population may have taken place between delisting in 1999 and the present, without the state's knowledge. FWS' faith in assuming zero population growth in some states is not without support. The coordinator of the Santa Cruz Predatory Bird Research Group stated that California no longer monitors the entire state annually due to the expense, the fact that there has been no sign of decline or decrease in occupancy and productivity for over ten years, and the fact that the causes of decline (DDT and shooting) have largely been eliminated. AR 4231. Additionally, the agencies in at least some of the states without current data are in favor of the recommended take. AR 4477 (Arizona), 4492 (California).

The 2004 EA also addresses the quality of the data. AR 6066. It notes that the population is reported by different states in somewhat different ways, covering different time periods, and with different survey intensities or coverages. FWS concluded that the data met the minimum prescribed by a study, Steenhof (1987), and note that the data used to decide on delisting was reviewed by the Raptor Research Foundation, which found that the data supported

the decision to delist. FWS relied on the information from the states which shows that there is continued growth even with conservative assumptions about the number of nesting pairs in some states. Because the analysis showed that a take of a limited number of nestlings under an array of survival and productivity values has a minimal effect on the growth of the population, FWS concluded that the variation in state reporting was acceptable.

It was not unreasonable for FWS to assume zero population growth in the four states.

3.      Hoffman & Smith Report

Next, plaintiffs argue that the single published scientific report, Stephen W. Hoffman & Jeff P. Smith, Population Trends of Migratory Raptors in Western North America, 1977-2001, cited by FWS to support its finding that the peregrine population has increased, actually documents a decrease in peregrine observations after 1998.

FWS contends that plaintiffs' reference to the study is highly selective and should not detract from the study's conclusion that most, if not all of the data confirmed strong increases for peregrines, especially during the early to mid-1990s.

The 2004 EA states:

Recent published data support the evidence of an increase, with migration counts having ' . . . confirmed strong increases, especially during the early to mid-1990s' in peregrine falcon observations in the western United States (Hoffman and Smith 2003).

AR 6056. Plaintiffs point to the following statement from the study, which covered the years 1977-2001:

Despite a lack of statistical significance (partly a result of the shorter period), Peregrine Falcon passage rates in the Bridger Mountains followed a pattern similar to other migration sites, increasing through 1998, decreasing thereafter.

AR 7743-44.  Defendants rightly point to the study's caveat concerning the lack of statistical significance for this data.  The study also found that four other migration sites in the western states had significant to highly significant increases for peregrines through 2001 and one other migration site had a strong increase through 1998, and then dropped and stabilized during the following years.  AR 7743-44.  In conclusion, the study stated that "most, if not all, of our migration datasets confirmed strong increases, especially during the early to mid-1990s." AR 7754.

The study is quite positive overall and cannot be used to support plaintiffs' position that any take potentially threatens a wildlife population.

### 4.    Decline in Alaska Productivity

Plaintiffs contend that the data from Alaska documents a decline in the peregrine productivity rate, to 0.95, AR 6057, which should have triggered a special investigation on the status of the Alaska peregrine population.

I agree with FWS that the monitoring plan is not at issue in this action.  Moreover, as FWS points out, the 2004 EA concluded that adult survival, and not first-year survival, is the most important parameter for peregrines.  AR 6063.  Thus, a production rate of 0.95 for Alaska is not especially significant for purposes of determining how the take will affect the population.

### 5.    Use of Statistics

In their reply brief, plaintiffs contend that FWS misinterprets the information in the EA with its argument:  "That is, with a 0% take, lambda[4] is 1.03, meaning that the population

---

[4] Lambda is the rate of population growth.  A lambda value greater than one indicates a growing population.  A lambda value of less than one indicates a decreasing population.

expands by 3% per year, and with a 5% take, lambda is 1.02, meaning that the population

expands by 2% per year. The population continues to grow, at an almost imperceptibly slower

rate." Mem. in Supp. of Federal Def.'s Cross Mot. for Summ. J. at 24. (internal citation

omitted). Based on the Bierzychudek Declaration, the target of the motions to strike discussed

above, plaintiffs contend that the difference in the annual growth *rate* between 2% and 3% (or a

1% net decline in annual population growth) actually means that there would be 33.3% fewer

additional peregrines in a year. Thus, plaintiffs contend that FWS did not analyze the correct

magnitude of decrease when it considered the decline in annual population growth rate.

Defendants all dispute plaintiffs' argument. Arizona contends that plaintiffs mistakenly

believe that the model results in Appendix 2 reflect percentage differences in the rate of

population growth at different levels of take. Instead, Arizona argues that the changes in lambda

reflect a net difference in lambda and not a percentage difference in the rate of population

growth. Arizona argues that this is obvious if you trace the EA through its draft versions, to see

the change in the presentation of the data in the table. Wyoming applies the statistics to the

known population of 3,604 adult peregrines. A 3% rate of growth results in an increase of 108

peregrines in the first year while a 2% rate of growth results in an increase of 72 peregrines. The

difference between the two increases in absolute numbers of additional peregrines is 36

peregrines, or 33% of 108 peregrines. The 36 new peregrines are also equal to 1% of the 3,604

original peregrines. Thus, Wyoming argues that plaintiffs are arguing a semantic difference.

FWS agrees, noting that Bierzychudek restates the same conclusion reached by FWS but uses a

different measure to present a distorted picture.

I first note that plaintiffs take issue with the argument made in FWS' brief and not with a statement in the 2004 EA. Statistics are tricky – examples of the statistic applied to the hard numbers are frequently helpful, such as the examples offered by Wyoming. I understand why plaintiffs bristled at the description of "an almost imperceptibly slower rate" applied to a difference of 36 peregrines a year. That is argument however. The model shows that there is still a population increase, but it has slowed by one third. This is characterized by the 2004 EA as a minimal reduction that would be undetectable in any population monitoring. AR 6049. This is not an irrational conclusion.

C.    Lambda Values

Plaintiffs note a lack of explanation of how the changes in lambda values, as opposed to the actual values of lambda, relate to the impact of falconry take on the peregrine population. Plaintiffs see no basis for FWS' conclusion that the actual lambda values predicted by the model are not important to the agency's conclusions but the difference between the lambda values lead to a conclusion that falconry take will have only a "minuscule impact on the continued growth" of the peregrine population. Pls.' Mem. in Supp. of Mot. for Summ. J. at 23.

I first note that the 2004 EA concludes that a 5% take would cause a minimal reduction, not a minuscule reduction. AR 6049. The 2004 EA comments about the reason for the new focus on the changes in lambda values in several places. "In addition, we have concluded that it is probably more important and easier to understand if this assessment focuses on the effects of take on population change, rather than on absolute numbers shown by modeling." AR 6053.

FWS summed up the reason for its decision in its responses to the public comments.

We disagree that the change in λ is not as important as the difference between λ and 1.0. Determination of the exact value of λ for the western United States population is not possible without more detailed information about survival than is available in the scientific literature – in particular without simultaneous survival and productivity data. However, the number of known nesting pairs in the western U.S. clearly has grown in recent years. That change and changes in the number of peregrines seen in migration indicate substantial population growth. We believe that the available population data clearly support the conclusion that λ is > 1.0. With population growth demonstrated by the data, our task is to determine the effects of take – that is changes in λ if take is allowed.

As noted elsewhere, **the actual value of λ is not the focus of these evaluations**. Lambda varies with locale and year due to many factors, but data from the States make it clear that the American peregrine falcon population in the western United States has grown substantially since delisting. It is not necessary to know the actual current value of λ, but the indicated growth of the American peregrine falcon population in the western United States provides strong evidence that λ has been above 1 since delisting. The focus of this assessment is the likely **change in** λ if take of nestlings is allowed. Our intent was to evaluate different levels of take with the most accurate population and productivity data available. Our evaluations make it clear that the limited take proposed by the States will not significantly change the demography of the American peregrine falcon population in the West.

AR 6093 (emphasis in the original).

FWS gave a reason for its change in focus. Data from the states shows that the population has increased since delisting. FWS' analysis allows it to take a broader view of the effect of the different levels of take on the rate of future growth. That translates into the effect on the actual population. FWS' explanation does not run counter to the evidence before it but instead was driven by the evidence before it.

D.      Revision of Assumptions

Plaintiffs see no explanation in the 2004 EA for why FWS abandoned its conservative approach when making assumptions used in modeling the impacts of falconry take. Plaintiffs point to the 2001 EA's assumption that peregrines begin to breed at age three which changed to

the 2004 EA's assumption that various proportions of peregrines first breed at age two. Similarly, the 2001 EA assumed that adult peregrines suffer a 20% mortality rate and the 2004 EA assumes that post-first-year mortality has been less than 20% per year.

FWS contends that once it withdrew the 2001 EA, it re-evaluated the modeling parameters. This resulted in FWS changing the model input parameters because the modeled predictions, using the original conservative input parameters, conflicted with the real world data FWS accumulated and analyzed. FWS argues that it changed the breeding age to two to more accurately reflect the true biological condition, even though the model would be less conservative. FWS notes that two studies and a third expert support the lower breeding age. It claims that the model produces outcomes with assumptions ranging from 100% to 0% of two-year-olds breeding and also assumes that the percentage of two-year-olds breeding would decline over time, as shown in the Tordoff studies.

FWS notes that the various outcomes of the model for all realistic circumstances show that populations will continue to grow until the population in the western states reaches its maximum carrying capacity. FWS contends that the most current population and productivity data for the western states show that a 20% first-year mortality rate does not reflect real world conditions. FWS believes the 2004 EA shows that estimates of mortality in adult populations range broadly and are based on a 2002 study rather than 20 or 30 year old studies.

The 2004 EA supports FWS' argument here. Comparison of the original model with the data from the states indicated that something was awry. FWS was confident that the data from the states was accurate and was the best available data. It reasoned that one or more of the parameters in the original model was inaccurate. AR 6048. The changes to the assumptions are

fully explained. AR 6063. Studies also support the new assumptions. AR 6056, 6059, 6063.

Most importantly, the model was run with different percentages of two-year-olds breeding and

different levels of post-first-year mortality. This gave FWS the ability to determine which

parameters had the most effect on the model when changed. Plaintiffs' argument is without

merit.

      E.    <u>Summary</u>

FWS collected the best available data from the states, tested its assumptions against that

data, and concluded that there was a problem with the initial assumptions, which were extremely

conservative compared with some of the studies cited. FWS then refined the assumptions and

ran the model in numerous configurations so it could determine which parameters were most

sensitive to change. It further decided to focus on the change in lambda caused by different

levels of take because the data was not sufficient to allow it to calculate actual lambda levels.

FWS has considered the relevant factors and articulated a rational connection between the

facts and its conclusions. Its proposed alternative is broadly supported by the states and the

falconry associations. Very few negative comments were made about the decision to allow a 5%

take. I also note that many believe that the actual population is far higher than the known

population on which the 2004 EA is based. AR 3688, 4429. The actual population contains

unknown aeries and floater birds who do not have a nest. This provides an added cushion for the

effects of a 5% take.

In summary, I find that FWS' determination that a take of 5% of nestlings would not

threaten the peregrine population is not arbitrary and capricious. I grant summary judgment in

favor of FWS and the intervenors and dismiss the MBTA claim.

II.     National Environmental Policy Act

Plaintiffs contend that FWS did not take the requisite "hard look" at the environmental consequences of allowing a take of peregrine nestlings for falconry. They contend that several factors require FWS to prepare an Environmental Impact Statement ("EIS") rather than an EA.

FWS argues that it properly concluded that the impacts of the action are not significant. FWS notes that the regulations require the agency to consider both the context and the intensity of an action when determining whether the action will significantly affect the quality of the human environment. FWS claims that plaintiffs only address the question of intensity and, for that issue, base their argument on only three of the ten environmental factors the agency is to consider as specified by the regulations.

NEPA does not guarantee substantive results but only sets forth procedural mechanisms to ensure proper consideration of environmental concerns. Carmel-by-the-Sea v. United States Department of Transportation, 123 F.3d 1142, 1150 (9th Cir. 1997). The court cannot substitute its "judgment for that of the agency concerning the wisdom or prudence of a proposed action." Id. NEPA does not require unanimity of opinion. The concerns and criticism of other federal agencies or other experts do not undermine the validity of the environmental documents. "[W]hen faced with conflicting evidence, an agency may rely on its own evidence." Id. at 1151.

When reviewing the adequacy of a NEPA document, the Ninth Circuit uses a "'rule of reason' that asks whether an EIS contains a 'reasonably thorough discussion of the significant aspects of the probable environmental consequences.' Under this standard, '[o]nce satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is at an end.'" Oregon Natural Resources Council v. Lowe, 109 F.3d 521, 526 (9th Cir.

1997) (citation omitted) (quoting Idaho Conservation League v. Mumma, 956 F.2d 1508, 1519

(9th Cir. 1992)) (reviewing EIS); Klamath-Siskiyou v. Bureau of Land, 387 F.3d 989, 992 (9th

Cir. 2004) (reviewing EA).  "[C]ourts must also be mindful to defer to agency expertise,

particularly with respect to scientific matters within the purview of the agency."  Klamath-

Siskiyou, 387 F.3d at 993.

A.    Cumulative Impacts

Plaintiffs contend that the 2004 EA contains only an extremely brief and perfunctory

mention of cumulative impacts on the peregrine population, even though FWS acknowledged

potential effects on peregrines due to recreational rock climbing, detrimental land use activities,

and actions permitted by Habitat Conservation Plans ("HCPs") approved under the Endangered

Species Act.  Plaintiffs characterize FWS' reasoning as an implicit analysis of all the impacts that

cumulatively have affected the peregrine population.  Because plaintiffs do not think FWS has

current population data, they argue that there is no support for the conclusion that the cumulative

impacts have had no negative impact.  Plaintiffs also contend that there is no support for FWS'

assertion that the activities affecting peregrines have not changed since delisting and are unlikely

to change in the future.  Plaintiffs point to a growing human population, expanding use of

chemicals, expanding demand for recreation, disturbance of nests by the falconry take itself, and

the heavy toll that the West Nile virus has taken on many avian species.

FWS relies on its argument addressed above concerning the accuracy of the data on the

peregrine populations.  FWS notes that a cumulative impacts analysis is to consider the impacts

of past, present, and reasonably foreseeable future actions.  It contends that West Nile virus is not

a proposed action, and thus does not need to be addressed in the analysis.  Alternatively, FWS

claims that it will address any impact from the West Nile virus through its adaptive management process. FWS also argues that the 2004 EA appropriately addresses the activities raised by plaintiffs. It concluded that the impacts will not be significant because the activities were ongoing during the peregrine's recovery period and did not have a significant impact. Concerning the impact caused by the take itself and related disturbance of the aeries, FWS contends that its solution of requiring the Management Team to take any problems into account as they arise is an adequate solution.

NEPA requires the consideration of cumulative environmental impacts from multiple actions. Neighbors of Cuddy Mountain v. U.S. Forest Service, 137 F.3d 1372, 1378 (9th Cir. 1998). A "cumulative impact" is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . ." 40 C.F.R. § 1508.7. To consider the cumulative effects, quantified or detailed information is required. "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." Cuddy Mountain, 137 F.3d at 1380 (reviewing EIS); Klamath-Siskiyou, 387 F.3d at 993 (reviewing EA). The detail must be sufficient "to be useful to the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts." Muckleshoot Indian Tribe v. U.S. Forest Service, 177 F.3d 800, 810 (9th Cir. 1999).

The 2004 EA has a half page section entitled "Cumulative Impacts":

We expect the cumulative impacts of human activities on peregrines to continue to be small. The largest single cause of the peregrine population decline was persistent pesticides – a problem substantially reduced by prohibition of the pesticides in the U.S. Another potential cause of mortality or abandonment of nesting, recreational rock climbing, sometimes occurs in areas used by nesting

peregrine falcons (e.g. Garrison and Spencer 1996). However, White et al. (2002) reported that "Rock-climbing and activity of researchers are not usually detrimental when reasonable precautions [are] taken." Recreational rock climbing may need to be carefully managed in some locations, but will not have a substantial effect on the American peregrine falcon population. Land use activities likely will have the largest effect on peregrines, but the population growth in the western U.S. indicates that peregrines continue to expand their use of the available habitats despite possible detrimental land use activities.

Another possible impact is development of Endangered Species Habitat Conservation Plans (HCPs). There are currently 27 HCPs in effect that cover peregrine falcons in some way; 19 for locations in California, one for a location in Nevada, two for locations in Utah, and six for locations in Washington. In general, they may allow take of foraging habitat. Take of birds under the plans is very unlikely.

This assessment covers the one action that will occur in addition to ongoing impacts on American peregrine falcons in the western United States – take for falconry. We will continue to review new data on cumulative impacts of human activities and the status of the American peregrine falcon population in the western U.S.

AR 6062. There is also a brief statement that if FWS determines that new impacts such as West

Nile Virus or new pesticides substantially affect the population, it may revoke the authority for

take. AR 6068. FWS also responded to comments about the cumulative aspects section in the

draft EA:

Incidental take of peregrines occurred during recovery, as did activities such as logging, mining, rock climbing, and building and bridge maintenance. Because productivity data were derived from the periods during recovery and after delisting when such activities were occurring, the evaluation of the proposed action was a <u>cumulative assessment of all impacts</u> to the population if take of nestlings for falconry is added. The indicated American peregrine falcon population in the western United States has continued to grow since delisting. We see no reason to delay management actions until the completion of monitoring. In fact, the argument can be made that such actions should be taken <u>while</u> monitoring is ongoing.

AR 6104 (emphasis in the original).

In Klamath-Siskiyou, a case reviewing the adequacy of EAs for geographically close timber sales, the court held that a "Cumulative Effects" section of more than a dozen pages was inadequate. Klamath-Siskiyou, 387 F.3d at 994. The court discussed several problems with the section, including its discussion of the direct effects of the sale at issue on its own minor watershed rather than the combined effects of all sales on all watersheds, and the failure to quantify the combined environmental impacts. Id. In the case of the timber sales, the court was interested in effects such as the number of acres affected, the amount of sediment added to streams within a watershed, and road density, and amount of suitable and dispersal spotted owl habitat. Id. and n.1.

Both FWS and plaintiffs concentrate on the impact to the peregrines caused by the activities of humans, such as pesticide use, rock climbing, and land use activities. Nobody discusses the impact on the environment resulting from this action, the 5% take. I think the take of peregrines is fundamentally different from a timber sale. The logging permanently removes trees, changes habitat because of road building, and causes additional sediment to flow into the watersheds. Actions like this have an effect on the other species living in the area. A take of peregrines changes the number of birds in the wild, and thus the possibility that humans can observe the magnificent birds, but no one has discussed other impacts. Plaintiffs have not explained to me what impacts they want quantified other than the number of peregrines.

The discussion above about why FWS focused on the change in lambda values notes that FWS could not calculate actual lambda values without more detailed information about survival than is available in the scientific literature. AR 6093. The 5% take, when moderated by some states refusing to allow any take, is not expected to "produce a population change that could be

detected in any population monitoring." AR 6065. Other than the type of statistics provided in the 2004 EA, I am not persuaded that FWS could further quantify the cumulative impacts of human activities on peregrines. Likewise, I do agree with FWS that "[b]ecause productivity data were derived from the periods during recovery and after delisting when such activities were occurring, the evaluation of the proposed action was a cumulative assessment of all impacts to the population if take of nestlings for falconry is added." AR 6104 (emphasis deleted).

I conclude that FWS has taken the required hard look at the cumulative impacts and adequately explained them in the EA.

B. Necessity of Environmental Impact Statement ("EIS")

An agency may prepare an EA as a preliminary step to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS. Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1212 (9th Cir. 1998), cert. denied, 527 U.S. 1003 (1999). An EIS must be prepared for all "'major Federal actions significantly affecting the quality of the human environment.'" Id. (quoting 42 U.S.C. § 4332(2)(C)). The test has also been stated as whether "substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor." Id. Regulations guide the determination of "significance." 40 C.F.R. § 1508.27. If the agency decides not to prepare an EIS, it must give a "convincing statement of reasons" to explain why the impacts are insignificant. Id.

Plaintiffs argue that FWS should have prepared an EIS for two main reasons: (1) the uncertainty of the effect of the take; and (2) the precedential nature of the decision. "'Significantly' . . . requires consideration of both context and intensity." 40 C.F.R. § 1508.27.

Plaintiffs' arguments are based on two of the factors considered when evaluating intensity. The parties both contend that a consideration of the context of the action favors their argument. I agree with plaintiffs that the context of the take, eleven of the western states, weighs in favor of a more significant action because such a large portion of the country, and the peregrine population, will be affected. FWS' arguments about the intensity of the action, however, more than make up for this, leading to a conclusion that the action was not significant enough to require an EIS.

            1.     Uncertainty of the Effect of the Take

One factor is "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." Id. at § 1508.27(b)(5).

Plaintiffs contend that there is substantial uncertainty surrounding the current status and trend of the peregrine population, as discussed above, leading to uncertainty over the likely impacts of allowing falconry take.

FWS again maintains that plaintiffs' argument about the inadequate data on the peregrine population is meritless. Thus, FWS contends that any uncertainty is not substantial enough to require an EIS. FWS further argues that the 2004 EA acknowledged that not all western states are expected to allow a take, that the population will naturally adjust to further minimize impacts, that available data show that many falcons are not permanently removed from the wild and eventually return, and that a joint state/federal team will review the take of nestlings every year and recommend adjustments in the allowable take, or even terminate the take.

For the reasons stated above in the analysis of the Alaska statistics and the lack of current data in some states, I do not believe that the possible effects are highly uncertain. The peregrine is a highly studied species and has shown a long and steady population growth. As FWS notes,

there are other factors which can only minimize the effect of the take. In addition, there is no

argument that the risks are unknown or unique. This argument is not persuasive.

　　　　　2.　　　Precedential Nature of the Decision

　　　　Another factor is "[t]he degree to which the action may establish a precedent for future

actions with significant effects or represents a decision in principle about a future consideration."

Id. at § 1508.27(b)(6).

　　　　Plaintiffs argue an EIS is required is because of the precedential nature of the decision to

allow falconry take prior to compiling a single year of federal monitoring data required by the

ESA. Plaintiffs note that this is the first time FWS has considered allowing take of a recovered

species without completing the mandatory five-year monitoring period and without compiling a

single year of data from federal monitoring efforts.

　　　　FWS argues that the Ninth Circuit has rejected the argument that a single decision sets a

precedent for unrelated actions. FWS notes that proposals to delist grizzly bears and wolves are

only at the proposal stages and that any proposal to allow a take of either species will require

analysis in a NEPA document.

　　　　Plaintiffs cite Sierra Club v. Marsh, 769 F.2d 868 (1st Cir. 1985), in which the court was

considering whether an EA was adequate for a project to build a new terminal consisting of a

cargo port and causeway at Sears Island in Maine. The court concluded that an EIS was required,

relying in part on the precedential nature of the decision to build the project. Plans were already

drafted for further industrial development if the Sears Island terminal was built. The record also

indicated that if the terminal was built, there would not be another major port facility built in

Maine for a long time.  Consequently, any new shipping traffic and industrial development would be funneled into the area.  Id. at 879.

I do not see how the economic pressure described in Sierra Club supports an argument that the peregrine decision is precedential concerning the take of any species removed from endangered status in the future.  The case is not persuasive here.  A similar argument did not convince the Ninth Circuit in Presidio Golf Club v. National Park Service, 155 F.3d 1153, 1162-63 (9th Cir. 1998), in which a public clubhouse was to be built at the Presidio near the historic private clubhouse.  Because there were no plans for other development, the court held that the decision to build the public clubhouse would not serve as a precedent.  Id. at 1163.

Also instructive is Anderson v. Evans, 371 F.3d 475 (9th Cir. 2004), in which the court concluded that an EIS was required for the government's decision to approve a whaling quota for the Makah Tribe.  Plaintiffs there argued that the approval of the hunting quota could have a significant precedential impact on future International Whaling Commission[5] ("IWC") quotas.  The court held that approval of a quota for one group for a limited time period was not binding on future IWC decisions about other groups and thus was insufficient on its own to demonstrate a significant environment impact.  The court did agree, however, that there was sufficient merit to plaintiffs' concerns to support a conclusion that there were substantial questions about the quota's effect on the environment.  This was due to some of the language in the IWC's regulations.  Id. at 493

---

[5] Comprised of members from each of the countries ratifying the International Convention for the Regulation of Whaling.  Id. at 1012 n.6.

The factor differentiating <u>Anderson</u> from the peregrine question is the fact that <u>Anderson</u> concerned how various international groups would deal with a single species. Here, we are talking about the effect on other species such as wolves and grizzlies. Any take of the other species would be controlled by the United States so a NEPA document would have to be prepared. That was not the case in <u>Anderson</u>.

I conclude that the decision to allow a take will not create a precedent.

        3.      <u>Summary</u>

Plaintiffs' arguments have not persuaded me. I find that FWS took a hard look at the question and gave convincing reasons why the take will not significantly affect the quality of the human environment. Accordingly, an EIS is not required.

C.      <u>Other Claims Raised in the First Amended Complaint</u>

Plaintiffs raise three other NEPA claims in their First Amended Complaint:

– Failure to adequately describe the scope of the proposed projects, as required by 40 C.F.R. § 1502.15. Plaintiffs allege that the 2004 EA violates NEPA because it does not indicate where take will occur, other than in the western states and Alaska, and does not provide any site-specific assessment of how allowing take in any one state or from any one peregrine population center will affect the population at that site or as a whole;

– Failure to insure scientific integrity, as required by 40 C.F.R. § 1502.24. Plaintiffs allege that FWS did not rely on reputable scientific data and did not disclose the state-gathered information it used to the public; and

– Failure to gather information necessary for a reasoned decision or disclose that the cost of gathering such data is exorbitant, as required by 40 C.F.R. § 1502.22. Plaintiffs allege that

FWS neither gathered reputable scientific data concerning the rate of change of the peregrine population over time nor disclosed to the public that the information was missing and necessary to make an informed decision.

Neither party provided any argument about these three claims. They appear to me to be a restatement of plaintiffs' arguments concerning the validity of the states' data. I also do not see the need to specify the scope as specifically as plaintiffs allege. For the reasons above, I grant summary judgment in favor of FWS and the intervenors.

D.    NEPA Summary

FWS took the required hard look when drafting the 2004 EA and making the Finding of No Significant Impact. The 2004 EA's cumulative impacts section is adequate. An EIS is not required. None of the other claims raised by plaintiff have merit. I grant summary judgment in favor of FWS and the intervenors against all of plaintiffs' NEPA claims.

///

///

///

///

## CONCLUSION

Defendant Intervenors NAFA's and Wyoming's Joint Motion to Strike Plaintiffs' Declaration and Documents (#84) is granted in part. Federal Defendant's Motion to Strike (#89) is granted in part. Plaintiffs' Motion for Summary Judgment (#51) is denied. Intervenor-Defendant State of Wyoming's Motion for Summary Judgment (#60), Cross Motion for Summary Judgment by Defendant/Intervenor State of Arizona (#63), Federal Defendants' Motion for Summary Judgment (#71), and Defendant-Intervenor NAFA's Cross Motion for Summary Judgment (#73) are all granted. This action is dismissed with prejudice.

Dated this ____21st_____ day of July, 2005.


____/s/ Garr M. King_____
Garr M. King
United States District Judge